This video was made in Cooperation with the American Archaeological Survey. Learn more about the American Archaeological Survey at https://www.youtube.com or click the link in the description. 05-1597 Secretary of Agriculture v. Omni Development Corporation Q. Mr. Black, I would like to start by pointing out on damages that this case is not unprecedented. This Court has a really on-point precedent of energy capital that we cited in our brief. This is a situation like energy capital where the government terminated a contract before performance could begin. In energy capital, the contract was a contract for the contractor to run a loan program for HUD. It was supposed to originate $200 million of loans over a three-year period. There were a number of steps, of course, before any of those loans could be issued to owners of HUD properties. Analyses had to be performed. First mortgages had to agree to waive certain rights. There were a lot of contingencies in the performance of that contract in energy capital. The government terminated the contract unlawfully before the loan company could start performance. This Court affirmed, the Court of Federal Claims approving, that the performance of all of those loans and the profits that would have been made on all of those loans was not barred by the collateral undertakings clause. What you've got to look at is what is going to flow directly from the performance of the contract. What is the result of the immediate and direct fulfillment of the contract? In energy capital, even though there were a lot of contingencies, this loan company was going to make $200 million worth of loans. It was going to make about 2% interest on all of those loans, which was its lost profit. In this case, Omni was going to build a building under this lease. It was clearly contemplated in the lease. The government got to review the construction plans. The government knew that Omni had to finance the building. Omni was going to build a building, lease it to the government. The government was going to rent it for 10 years, and then at the end of the lease Omni was going to own this building. During the course of the lease, Omni was going to pay off its mortgage and own the building free and clear at the end of the lease. So just as this court affirmed in energy capital, it's permissible. Omni's expectancy damage, the immediate and direct result of the fulfillment of this lease was its ownership of the equity in the building at the end of the lease. So this case is not without precedent. I should point out that there are factual findings that are entitled to deference that the board made explaining how financially this lease was supposed to work for Omni and what Omni's expectations were. The board pointed out that Omni had two expectations. One was a stream of rent payments, and the other was accruing equity in the building over the lease as it used the rent payments to pay off the mortgage. And in this case, it turned out that because Omni was using the rent to pay off the mortgage and the way it had priced the contract, it was basically a no profit on the rent payments. But Omni was going to be accruing equity, and that was its profit. That's what it was going to own at the end of this lease. That was the natural result. Didn't the board find there were not accrual damages like in energy? And that concerns Omni's cross appeal. And that's sort of our argument that when the board was considering the impact of the collateral undertakings doctrine, it made the factual findings that Omni, that the equity was accruing over the course of the lease. And in fact, those factual findings are on pages 64 and 65 of its decision. This is what the board found. The reversionary value of the property was the equity Omni would have owned at the end of the lease. Through payment of debt service, Omni would have been building equity in the building. Omni's return on this lease would be both from the income in the lease and the equity that would follow. There would have been profit and value in the building that Omni would have owned essentially green clear at the end of the lease. And here's the kicker. Had the project been completed, Omni would have secured a return on its money through the return of equity due to payment of its debt service. Its ultimate return and profit was thus the ownership of the building. How do you accrue equity? You pay the principal of the mortgage, 10-year mortgage. These were the facts. And so this was accrual damage. And that was the one error the board made when it was determining when to discount damages, which date was appropriate for discounting. It should have been consistent just as it had treated the equity in Omni's building as accrual damages in its earlier analysis. It should have been consistent in that analysis, applied the same facts it found, applied the law to the same facts it found. These are accrual damages. In the energy capital, this court clearly held that accrual damages are different from other kinds of damages. And that instead of determining damages from the date of the breach, you determine them as they go along in the contract. And then if there's any that were – to the extent they were accrued after the date of judgment, you discount back to the date of judgment. And that was the error that Omni is asserting in its cross appeal, which is very easy to correct. It's a mathematical calculation. What about the risk factor involved, though, that the board found required discounting to the date of breach? Well, the risk factor had to go in with the discount rate, and that's a 13 percent discount rate. And we don't appeal that a risk-based discount rate was appropriate in this case. Instead, if there are accrual damages, you're supposed to discount to the date of judgment. So the board did factor in risk. In the discount rating, we don't disagree with that on appeal. Regarding the adequate assurances provided by Omni, I think one of the things that's important to point out up front is that the board found as a fact that Omni actually was offering more assurances, and the government basically cut off Omni and said, we don't want to hear anymore. And this is a fact that is on page 22 of the board's decision, where the board is finding facts. Omni's attorney, a fellow named Duncan Stedman, called the contracting officer. It was the day before the termination. And he said – he asked the contracting officer what documentation could he help her get and what could he do to reassure her on the issues that she had raised. And Mr. Stedman testified, and the board found his testimony credible. It's an important finding that's expressly in there. That the contracting officer refused his offer, and she said, no, we're going to terminate, so we don't need anything. So unlike almost any other adequate assurances case, here you've got the complaining party saying, we don't want any more assurances. And then on appeal, they're saying, where's the beef? But what are you asking us to make of that? There were delays, and there were extensions, and there were setbacks. Right. The weight that the contracting officer gave to them, apparently, by that point, were quite large. Well, on the issue of assurances, I would ask the court to find that legally what Omni did provide was sufficient assurances. Omni, through its – Mr. Quayle and its attorney had phone calls with the contracting officer and a letter that detailed – laid out in detail its commitment to the lease and its plan for performing on time. And some of the financing, obviously, was a concern to the contracting officer. What Omni – the information that Omni presented to the contracting officer was corroborated by the financing company itself. Mr. Pitcher of Equitable Insurance had had communications with the contracting officer and her representative. And her – his information confirmed what Omni was telling the government, that it had a viable plan, that the loan was before the loan committee, that Mr. Pitcher had recommended approval. A decision was pending in a few days. If that decision came, Omni had plenty of time to get started on time in early July to finish on time. And it's worth keeping in your mind, this is a contract where Omni still had more than 100% of the time left for performance to do less than 100% of the work. Because Omni – and these are found facts – in November of 1996, Omni had actually started doing some of the grading and had gotten a head start because it had gotten permission from the city. So getting back to adequate assurances, the government is entitled to reasonable assurances, and that's exactly what Omni provided. A detailed plan that was corroborated by other sources. The contracting officer could have checked up on the status of the billing permit with a simple call. She chose not to do that, but it was – she was capable of verifying. Now, we're reviewing the board here, not the CO's action, right? That's correct. And we defer to the board on fact questions, substantial evidence questions, deference. And the fact question is whether there was a reasonable basis for a conclusion that the building would have been completed on time. Okay, and that's sort of shifting to the Lisbon standard, away from adequate assurances. And here, if you read the board's decision, it's very detailed, very thorough. The Lisbon standard is trumpeted numerous times throughout the analysis. Lisbon requires the government – the burden is on the government to prove a reasonable basis for finding that there was no reasonable likelihood of time of performance. And all this board did was follow Lisbon to a T and put the burden on the government to prove a reasonable basis. And the conclusion, after considering all the evidence, was that the government had failed its burden. The board applied the standard correctly, with the right weight to the evidence. And it's worth keeping in mind that terminations for default are unlike almost any other governmental action. Most governmental actions, when they come up to a judicial body, they're entitled to a presumption of correctness. And the burden is on the contractor to show that there was an error. And again, with terminations for default, they don't get that presumption of correctness sort of coming into the board. The burden remains on the government to prove that what it did was correct. And again, if you read the opinion, it's well-reasoned, very thorough. It went through the analysis. The board just held that the government didn't meet its burden, and that was proper application of the standard. I do want to point out, discuss this expert opinion testimony that the board decided was not proper to conclude. A couple of points that I'd like to reinforce on that was that this evidence, the board was considering evidence that was known to the contracting officer, and would consider evidence not known to the contracting officer if it would provide an independent ground for a termination. And that's where this court's case law has been. And the evidence we're talking about was post-termination opinion about the strength of Omni's loan application. The underlying loan application was before the board. There was a lender that declined that loan application. That was before the board. All the board decided was not to consider was this independent post-termination opinion that did not – Omni was not contracting to provide – to have a strong loan application. It was contracting to build a building. So this was not an independent ground for protest – independent ground for default. And so it was proper to exclude that. A couple of other things I'd point out on that point. Number one, the government did argue the exact opposite position below. I'd like to quote from its brief on this point. Just to – in its post-hearing brief, which is on A4988, the government below is telling the board, trying to exclude some of Omni's evidence, that the board should not consider facts unknown to the CO in assessing her reasonable belief. McDonnell Douglas – this is a quote. McDonnell Douglas recognizes that a CO's reasonable belief at the time of termination can only be based upon facts known to her at that time, regardless of facts which surface later. And now upon appeal, the government is arguing the opposite. This expert opinion analysis surfaced later, and it now wants that before the board. Now it claims the board should have considered it, despite what it argued to the board below. Lastly, there is a harmless error aspect of this too. The board did consider this evidence when it was assessing damages, because Omni had the burden of proving its damages, and so it did consider the likelihood that Omni could have gotten a loan. And this evidence was considered, and the board held that it did not change its assessment that Omni would likely have gotten – secured the financing it needed to build the building. So it just wouldn't make much difference under the Lisbon analysis. We sort of know what the outcome would be, even if the board had considered this. So I have about one minute left. I'd like to reserve that for rebuttal, if I could. Okay. Thank you, Mr. Black. On the cross-appeal. On the cross-appeal. Yes. If there's something to rebut. Yes. Mr. Chadwick. Thank you, Mr. Board. Thank you. Two or three quick things with respect to damages. We, of course, recited energy capital in our own brief. The key distinction there is that the purpose of the contract in energy capital was for that contractor to make the loans from which the income would afloat. The purpose of this lease was for the government to pay money to get office space. This was not, as Council once said, this was not even a contract to build a building. This was just a contract for the office space. It happened that Omni was building the building to provide it. The loss there, then, is the loss of the rental income. That is the entire focus and topic of the contract. With respect to damages. Was the reversionary interest foreseeable? In a pragmatic sense, perhaps, but it's not. Doesn't that bring it within most damages calculations? No, because it's still consequential. It's still within the rule that says if there is a transaction that's one or two or three steps removed from the contract before you, for instance, paying off my own mortgage probably depends on my continuing to receive a salary. That's foreseeable, but that's not a legal relationship. But the government continued to give extensions. That's really significant, isn't it? Despite the contract terms. And then all of a sudden said no more? Well, it's significant to a point, except that no one disputes that the December 31st date held the completion date. Secondly, we have a unanimous finding by the board, which hasn't been challenged, that the government did have a reasonable grounds to issue the cure notice at the time it did in June. So at that point, it becomes a somewhat different situation. If there's a reasonable grounds for a cure notice, that does trigger responsibilities, and there is an undisputed December 31st completion date. So the responsibility to the contractor to respond at that point is acute. We're the apt to leave with respect to the damages appeal. We've simply asked if there's going to be any adjustment in damages that the court bear in mind. The $20,000 deduction should have been made to the damages, and affirm on other grounds if there's any change. Again, with respect to the repudiation, the last argument is, again, as counsel described it, there were no facts presented to the agency, just simply promises. Thank you. Thank you, Mr. Chadwick. Mr. Black, do you have something to tell us? Just a few moments. Just with regard to the government's argument that the $20,000 loss, that Omni would have realized that that should be factored into if you make adjustments, that should have been another appeal by the government, and it didn't include that in its any appeal. No, we're on your cross-appeal only. Right, and so it's not time to raise that in rebuttal to our cross-appeal. And then I point out that in regard to our cross-appeal, the government really didn't say anything in opposition to it in its brief. And I'd like to end with that. Okay. Thank you, Mr. Black. Thank you both. The case is taken under submission.